**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

Case No. 2:13-CV-14246

JOHN RAE AND RONALD TAYLOR,

                Plaintiffs,

    v.

GINN DEVELOPMENT COMPANY, LLC, ,    **JURY TRIAL DEMANDED**
EDWARD R. GINN, III, EDWARD R. GINN
III REVOCABLE TRUST, GINN TITLE
SERVICES, LLC, A&G ENTERPRISES OF
SOUTH CAROLINA, LLC, DEAN ADLER,
IRA LUBERT, ERG ENTERPRISES, L.P.,
LUBERT-ADLER MANAGEMENT CO.,
L.P., LUBERT-ADLER PARTNERS, LP,
NEILL FAUCETT, and JOHN DOES 1-50,

                Defendants.

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

    John Rae and Ronald Taylor ("Plaintiffs") assert claims against Ginn Development

Company, LLC; Edward R. Ginn, III, Edward R. Ginn III Revocable Trust, Ginn Title Services,

LLC, A&G Enterprises of South Carolina, LLC, Dean Adler, Ira Lubert, ERG Enterprises, L.P.,

Lubert-Adler Management CO., L.P., Lubert-Adler Partners, LP, Neill Faucett, and John Does 1-

50 ("Defendants") for violations of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §

1701, et. seq., for violations of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

§§ 1961 *et seq.* ("RICO"), and Florida common law in connection with a scheme which began

and is continuing (or such time as will be established after a thorough review of Defendants'

records).  Each of the Defendants identified herein colluded to market, sell and finance real

estate to the Plaintiffs including at Bella Collina, Reunion, Tesoro, Laurelmor, and Ginn sur Mer residential communities developed by the Ginn and Lubert-Adler Defendants at prices that were fraudulently inflated through misrepresentations, manipulation, fraud, deceptions, omissions and unconscionable conduct, as described in detail below, in order to increase their profits at the expense of purchasers such as Plaintiffs. Each defendant victimized and misled Plaintiffs as to the value of such properties at the time of sale through a common scheme implemented by each defendant that involved every step of the real estate purchase process from the introduction of the property at sham sales "launches" at Ginn/Lubert-Adler communities, Bella Collina, Reunion, Tesoro, and Laurelmor and by fraudulently manipulating sales prices, deceptive marketing of the properties with standardized marketing materials through the mails and wires, to the systematic and intentional manipulation of property values through misrepresentations, fraud, deception, omissions and unconscionable conduct, and based upon materially false, artificially-inflated and purposefully manipulated sales prices and appraisals including at Bella Collina and Reunion.  This scheme directly harmed the Plaintiffs who were fraudulently induced to purchase three properties in the Ginn/Lubert-Adler Communities of Bella Collina and Reunion for much more than they were worth and far in excess of their fair market value at the time of purchase of the properties. As a direct result, the Plaintiffs have been financially devastated.

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962 and 1964; 28 U.S.C. §§ 1331, 1332 and 1367.

2.      This Court has supplemental jurisdiction over the state law claims asserted herein, pursuant to 28 U.S.C. § 1367(a).

3.     This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965 (b) and (d).

4.     The activities of the Defendants and their co-conspirators as described herein have been within the flow of interstate commerce on a continuous and uninterrupted basis and have had a substantial effect on interstate commerce.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district and Tesoro is located in Port St. Lucie in St. Lucie County, FL and/or or a substantial part of property that is the subject of this action is situated in this district.

## PARTIES

### A.     Plaintiffs

6.     Plaintiff John Rae is an individual who resides in West Midlands, England.

7.     Plaintiff Ronald Taylor is an individual who resides in Glasgow, Scotland.

### B.     Defendants

8.     Ginn Development Company, LLC, a member of which is The Ginn Companies, LLC, was founded in 1998 and is also known by a myriad of trade names formed and/or utilized by Edward "Bobby" Ginn and the Lubert-Adler Defendants for the purpose of defrauding Plaintiffs, including "The Ginn Company," Ginn Real Estate, LLC, and "Ginn Clubs and Resorts." Ginn Development Company, LLC is a Georgia limited liability company which transacted business throughout Florida that developed and marketed residential/resort communities at Bella Collina, Reunion, Tesoro, Laurelmor, and Ginn Sur Mer to the Plaintiffs. Lubert-Adler Partners, LP, (hereinafter "Lubert-Adler") and the Ginn Defendants conceived of the plan to market and sell real estate to the Plaintiffs at fraudulently inflated prices as alleged

3

herein. The officers, agents, employees and sales force of Ginn Development Company, LLC and the other Defendants were spread throughout myriad locations in Georgia, Florida, and Philadelphia, Pennsylvania. The Ginn and Lubert-Adler entities utilized a maze of affiliates, fictitious names, and subsidiaries that were under the control of the Ginn Development Company, LLC, including principal owners Edward "Bobby" Ginn, Ira Lubert, and Dean Adler. The Ginn and Lubert-Adler Defendants entered into partnerships including, without limitation: Ginn-LA, LLC; Ginn-LA Pine Island, Ltd., LLLP (Bella Collina); Ginn-LA Orlando Ltd., LLLP (Reunion); Ginn-LA Hammock Beach, Ltd., LLLP; Ginn-LA Wilderness, LLC; Ginn-LA Naples, LLC; Ginn-LA Hutchinson Island, LLC; Ginn BriarRose Holding, GP, LLC; Ginn LA-BriarRose Holdings, Ltd., LLLP; and Ginn-LA Hamlet.  ("LA" stands for Lubert-Adler). Lubert-Adler principal owners, Dean S. Adler, and Ira B. Lubert, as well as Neil B. Faucett were also managing members of Ginn Development Company, LLC.   Each reference to "Ginn" herein refers to Ginn Development Company, LLC and its affiliates and subsidiaries and employees and also includes members Dean Adler, Ira Lubert, and Neill Faucett. The moniker "Ginn" when used herein as a descriptive preface (i.e "Ginn salesperson")  denotes that the executives, officers, employees and/or agents so described operated under Ginn's and Lubert-Adler's control and authority.

9.     Defendant Edward R. Ginn, III ("Ginn") is an individual who purportedly specialized in land acquisition, real estate development, and related matters, but instead operated and orchestrated a massive Ponzi scheme.

10.     Mr. Ginn is sued herein both in his capacity as an individual and in his capacity as Trustee of the Edward R. Ginn III Revocable Trust dated September 14, 2002.

11.     Defendant Edward R. Ginn III Revocable Trust dated September 14, 2002, is a Trust which held a 99% interest in Defendant ERG Enterprises, L.P.

12.     Defendant ERG Management, LLC is a South Carolina limited liability company which held the remaining 1% interest in Defendant ERG Enterprises, L.P.

13.     Defendant ERG Enterprises, L.P. is a Georgia limited partnership which held a 20% equity interest in the Tesoro project.

14.     Ginn Title Services, LLC ("Ginn Title") is a Georgia corporation formed on September 21, 2005 by Richard T. Davis of Cameron, Davis & Gonzalez, P.A. ("Cameron Davis") and is the successor-in-interest to Ginn Title, LLC

15.     For convenience, Edward R. Ginn III, the Edward R. Ginn III Revocable Trust dated September 14, 2002, ERG Management, LLC, and ERG Enterprises, L.P. are referred to herein as the "Ginn Defendants."

16.     A&G Enterprises of South Carolina, LLC, was at all times material, a joint venture between Edward Ginn and Dean Adler of Lubert-Adler Partners, L.P. which conducted business in Pennsylvania, South Carolina, and Florida and participated in the sale of properties to the Plaintiffs

17.     Defendants Ira M. Lubert ("Lubert") and Dean S. Adler ("Adler") are individuals who co-founded and co-own Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P., and the affiliated Lubert-Adler "Group" entities.  Defendant Neill Faucett is a member of Ginn Development, LLC and a managing partner of Lubert-Adler Partners, L.P.

18.     Mr. Lubert serves as the Chairman of Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P and was a member of Ginn Development, LLC.

19.     Mr. Adler is the Chief Executive Officer of Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P and was a member of Ginn Development, LLC.

20.     Defendant Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P., is a Delaware limited partnership which provides management and other related services to the Lubert-Adler "Group" and "Fund" Entities.

21.     Defendant Lubert-Adler Partners, L.P., sometimes referred to as "LA," is a real estate private equity firm, domiciled in Delaware and headquartered in Philadelphia, Pennsylvania.  Lubert-Adler jointly developed and marketed the real estate properties at issue in this lawsuit, together with Ginn. The partnership between Ginn and Lubert-Adler "was structured such that the private equity firm [LA] put up all the money and took 80 percent of the profits." Geraldine Fabrikant, *It's Tee Time, Where is Everybody?,* The New York Times (October 15, 2009) (*available at*: http://travel.nytimes.com/2009/05/24/business/24golf.html).  Lubert-Adler and its principals, Lubert and Adler, had a "hands-on" approach to its investments in the Ginn developments purchased by Plaintiffs at Bella Collina and Reunion, and at the developments at Tesoro, Laurelmor, and Ginn Sur Mer, which were pitched to the Plaintiffs including involvement in presale and marketing strategies, forging the alliances that were critical to the execution and success of the scheme alleged herein with respect to the Plaintiffs and exercised control over the conduct alleged herein.

22.     Dean S. Adler of Lubert-Adler was a Managing Member along with Edward "Bobby" Ginn, of Ginn Development Company, ("hereinafter GDC") LLC, and exercised control over the activities of GDC, LLC.  He and the Ginn entities, reside in the Commonwealth of Pennsylvania but transacted business from 2000 through the present in the state of Florida.

23.     Ira Lubert of Lubert-Adler was also a Managing Member, along with Edward "Bobby Ginn," of Ginn Development Company, LLC, and exercised control over the activities of GDC and also resides in the Commonwealth of Pennsylvania.  He transacted business from 2000 through the present in the state of Florida.

6

24.    For reference, Ginn Development, LLC, Ira M. Lubert, Dean S. Adler, Neill Faucett, Lubert-Adler Management Co., Inc., Lubert-Adler Partners, L.P., and A&G Enterprises of South Carolina, LLC are referred to herein as the "Lubert-Adler Defendants."

25.    The Ginn and Lubert-Adler Defendants partnered and purchased land for the purported purpose of developing and creating communities and selling the properties therein. In 2004 and thereafter as to the Plaintiffs, the Ginn and Lubert-Adler Defendants conceived of a scheme to exploit the real estate market by marketing and selling properties at grossly inflated prices through a common fraudulent marketing and sales scheme. The scheme involved an agreement to (1) to aggressively use the mails and wires to pursue purchasers with lies and misrepresentations about property values, sales, and amenities; (2) to sell the properties at fraudulently inflated values supported by falsely recorded sales information and insider sales by Ginn and Lubert-Adler; (3) to sell the properties by fraudulently creating sham sales to be used as comparable sales and falsely recording this sales information, (4) by obtaining and causing others including Plaintiffs and lenders to rely on fraudulent appraisals with the intent to deceive; and (5) by enlisting the participation of complicit lenders such as R-G Crown Bank  n/k/a Fifth Third Bank, who were willing to knowingly provide and finance property sales for fraudulent inflated amounts for the Ginn and Lubert-Adler Defendants.   The Ginn and Lubert-Adler defendants implemented this scheme with the other unnamed co-conspirators including their preferred and complicit appraisers and builders. The communities subject to the fraudulent scheme as it relates to the Plaintiffs were:

       (1) Reunion Resort in Orlando, Florida;

       (2) Bella Collina in Montverde, Florida;

       (3) Tesoro in Port St. Lucie, Florida;

       (4) Laurelmor in North Carolina; and

(5) Ginn sur Mer.

26.     Between 2004 and the present, each defendant and each co-conspirator entered into the scheme with the intent to defraud and knowingly agreed to the overall objectives of the conspiracy knowing that fraudulent and illegal acts would be committed to further the objectives of the scheme.   The Defendants used the mails and/or participated in the mailing of false marketing materials to the plaintiffs in 2004, 2005 and thereafter which represented, *inter alia* the following statements in materials provided by the Defendants to Plaintiffs.

- The Lubert-Adler Fund is comprised of a series of equity investors that have raised more than $1 billion of institutional capital that has been invested into real estate ventures and has raised an additional billion dollars in capital to be invested in real estate ventures.

- It was founded by partners Dean Adler and Ira Lubert. Bobby Ginn has worked extensively with Lubert-Adler for more than 10 years and they have a 50% ownership stake in the company.

- In the last 36 months Lubert-Adler has invested more than $250 million in projects being developed by The Ginn Company and has approximately $250 million in new projects currently under contract by the company.

- The Ginn Company is the only company in which the Lubert-Adler Fund invests in Resort and residential real estate opportunities.

- Lubert-Adler Fund, Ginn best performing asset in the fund.

- Lubert Adler owns 50% of The Ginn Company and 80% of each project.

**Real Results**:

- December 2001- Reunion, Transactions= $40,000,000.

- March 2002- Tesoro, 350 Homesites= $57,000,000.

8

- Spring 2004-Tradition at Reunion, 302 Homesites, over 400 reservations to date with no marketing, only a whisper campaign.

- Spring 2004-Bella Collina, 115 Homesites, 115 Reservations in two weeks with no marketing.

- The Ginn Company is the leading producer for the Lubert-Adler Fund (emphasis added).

27.     By virtue of the foregoing statements and otherwise as described herein, from 2004 to the present, the Lubert-Adler Defendants held themselves out to Plaintiffs as providing funds to be used to secure and back the Ginn Communities in which Plaintiffs purchased three properties. The Lubert-Adler Defendants touted its backing of the Ginn communities by claiming they had invested more than $250 million in projects being developed by Ginn and were securing and backing new projects by Ginn with over $250 million dollars in new capital including as to Ginn/Lubert-Adler developments, Bella Collina and Reunion.  Ginn, with the knowledge and active participation by Dean Adler and Ira Lubert, provided false security to Plaintiffs through uniform written marketing materials which were provided to Plaintiffs to lend purported financial security and credibility to each of the Ginn communities including Bella Collina and Reunion, which was necessary to support the promised infrastructure and amenities. The foregoing and following statements were utilized to induce purchases by the Plaintiffs.  Plaintiffs directly relied to their detriment on the statements and representations made by the Ginn and Lubert-Adler Defendants.

28.     Plaintiffs read and directly relied upon Lubert-Adler's representation of its business model which emphasized a "pre-selling and phasing" strategy stating that: "[t]he key to this strategy is forging strategic alliances with financially motivated, local operating partners who possess superior local knowledge and execution capabilities. (A*vailable at*:

9

http://www.lubertadler.com/portfolio/residential-resort.php). Ginn and Lubert-Adler utilized this strategy to partner with the other defendants herein to execute their fraudulent plan and induce Plaintiffs to purchase three properties, two at Bella Collina and one at Reunion and also attempted to sell properties at Tesoro, Laurelmor, and Ginn Sur Mer to Plaintiffs.

29.     The Lubert-Adler Defendants also engaged in the pre-selling and planning strategy with the Ginn Defendants concerning the Bella Collina and Reunion communities as to the Plaintiffs. It participated with the Ginn defendants to develop and institute marketing and sales techniques that conveyed the false impression of high demand and a false sense of limited availability at Bella Collina and Reunion beginning with sham marketing-sales launch parties, which were named by each of the defendants as "Priority Reservation Selection Events." Plaintiffs were invited through the mails and wires to attend these sham launch marketing-sales events and requested to complete a "priority reservation form" which was mailed, emailed or faxed to them requesting they indicate which lots they wanted. Each of the defendants also solicited Plaintiffs by email which included specific references to Lubert-Adler. To create the appearance of limited availability of lots and memberships, each of the defendants invited far more buyers to these marketing-sales launches than could possibly purchase properties (for example, having 1,000 people present but offering only 300 lots at these launches, defendants orchestrated sham lotteries to select those "winners" who would be able to purchase lots.

30.     Edward "Bobby" Ginn, with the participation of his partners Ira Lubert and Dean Adler, also devised a massive "power of attorney" program (hereinafter "POA") to fraudulently obtain Plaintiffs and prospective purchaser's written authorization to participate in a so-called lottery process for each of the Ginn communities. The Ginn defendants, through the use of the mails and wires, mailed POA documents to prospective purchasers including Plaintiffs, which encouraged them to provide written authorization for them to bid to purchase all lots in the Ginn

communities including Bella Collina and Reunion. Ginn and its sales force, with the authorization and knowledge of the Lubert-Adler Defendants then followed up with letters and telephone calls encouraging Plaintiffs and prospective purchasers to provide written authorization to Ginn to designate their purchase of "each and every lot" at a Ginn Community prior to the marketing-sales launch in order to create the false impression of "sham" demand and "sham" supply.  By doing so, Defendants created a false sense of demand and limited supply at Bella Collina and Reunion.   Defendants' scheme was further intended to create the false appearance of a limited availability of lots prior to and at each sham "launch" at Bella Collina and Reunion and to commit a prospective purchaser to the purchase of a lot. Through this sham POA and lottery process, Ginn subsequently claimed that all or nearly all properties at each community had been contracted for as of the date of the sales launch at pre-arranged prices all set by the Ginn Defendants and Lubert-Adler Defendants.

31.     The Ginn Defendants and Ginn executives including Edward Ginn, Rusty Rogers, and Jeff Cox engaged in a fraudulent campaign in which they also made false promises, misrepresentations, and omissions to Plaintiffs concerning values of properties at Bella Collina and Reunion, including sham sales prices, proposed completion of infrastructure, and major amenities to be constructed at Bella Collina and Reunion in order to induce them to pay unconscionable prices for these properties which represented as much as ten (10) times the actual fair market value of the properties at Bella Collina and Reunion.   The false theme of promised amenities was uniform and had no reasonable basis in fact. For example, Ginn salesperson Bradley Douglas Smedberg promised private boat docks to Plaintiffs in 2004 and to Bella Collina purchasers, although local authorities had actually refused to grant permission for the installation of such docks.   The docks were also on site maps to which the Ginn sales force referred Plaintiffs and were referenced in Ginn's standardized marketing materials. The Ginn and

Lubert-Adler Defendants also promised luxurious fitness facilities and amenities to Plaintiffs in 2004, such as an equestrian course, beach club, golf courses, spas and sports complexes that they did not construct.  Both Ginn and Lubert-Adler knew or should have known that their promises and representations to Plaintiffs were false and materially misleading and had no reasonable basis in fact.  Bella Collina was marketed as having a world-class equestrian center, which was never built. In fact, as part of their fraudulent scheme, the Lubert-Adler and Ginn Defendants only built a small limited number of the promised amenities at Bella Collina and Reunion to give credence to their representations that all the amenities they promised would indeed be built to further support the unconscionable prices being charged by Ginn and Lubert-Adler.  Even though the Ginn defendants and Lubert-Adler knew that they could not provide most of the amenities they promised, like docking facilities, they continued to market the amenities, including them on detailed maps posted at the onsite sales offices at Bella Collina and Reunion and which were shown to Plaintiffs in person and in promotional materials, including those sent through the mails and wires. Other amenities, the Defendants simply never intended to build.  For example, the Lubert-Adler and Ginn Defendants did not timely break ground for the Bella Collina equestrian center or the sports complex at Bella Collina.  Plaintiffs relied directly on the misrepresentations made by the Ginn and Lubert-Adler Defendants concerning the sales prices, amenities, and timely completion of infrastructure to their detriment in purchasing the three properties at Bella Collina and Reunion.  Nevertheless, these promised amenities became a material part of the value of the fraudulent appraisals that were coordinated by the Defendants. At material times related to the Plaintiffs, there was no water, electricity, or utilities available to the lots.

32.     Each of the defendants also knew they needed to create false records of high sales prices to effectuate the scheme to sell Ginn/Lubert-Adler ("Ginn-LA") properties to Plaintiffs at

inflated prices and to give credibility to the false statements of value disseminated through its marketing plan to Plaintiffs.  Ginn and Lubert-Adler utilized Ginn and Lubert-Adler Defendant insiders for this purpose.  In particular, in order to create the appearance that property in Ginn communities Bella Collina and Reunion had a value far greater than their actual fair market value and greater than the value for which they were, in fact, originally sold, each of the defendants engaged in a pattern of fraudulent activities. For example, the Defendants would sell two or three properties to a single purchaser (typically a Ginn insider participating in the scheme) in a single transaction. Then, instead of recording each property at the actual sales price, the Ginn defendants would either cause each property to be recorded for the full purchase price of both properties or cause one of the properties to be recorded for the full price and the other for one dollar.  Through this mechanism, the Ginn defendants effectively caused the recorded sales price for the individual, simultaneously sold properties in amounts that far exceeded the properties' actual fair market values since an accurate and non-fraudulent recording of sales prices for each property would necessarily require that some significant portion of the total multi-lot sales price be ascribed to each of the properties rather than ascribing the total sales price to one or all lots.  Thereby, the Ginn Defendants created artificially "high priced" sales for the Ginn properties at Bella Collina and Reunion to falsely support their continued sales.  For example:

(a) Ginn sold Lots 260 and 391, Bella Collina to R.L. Vogel Homes (a Ginn insider and complicit builder) for a total of $707,800 on or about June 7, 2004.  Ginn then knowingly falsely caused to be recorded Lot 260 as having a sales price of the entire $707,800 and Lot 391 as being sold for one dollar. Ginn did this to create a falsely inflated value for Lot 260 of $707,800 so that such falsely inflated value could, in turn, be used by the participating appraisers and banks to support future inflated  appraisals and the knowing financing of properties with falsely inflated values in connection with sales to unsuspecting buyers.  Lot 260 was used to support falsely inflated appraisals and financing knowingly based thereon within Bella Collina.

(b) On August 30, 2004, Ginn/Lubert-Adler sold Lots 183 and 323, Bella Collina to Monty Schwartz for a total of $1,007,800.  Rather than ascribe a significant portion of the total

sales price to each of the properties, Ginn falsely caused to be recorded Lot 183 as having sold for the entire $1,007,800 and caused Lot 323 to be recorded as having sold for $1.00.  The Ginn Defendants did this to create a falsely inflated value for Lot 183 of $1,007,800 so that such falsely inflated value could, in turn, be used by the participating appraisers and banks to support future inflated  appraisals and the knowing financing of properties with falsely inflated values in connection with sales to unsuspecting buyers.  Lot 183 was later used as a comparable for future appraisals as having being sold for $1,007,800.

(c) On June 30, 2005, Ginn sold Lots 6, 13 and 45, (golf lots), Bella Collina West to Alstott Rorebeck, Marini Development & Holdings, LLC for a total of  $1,817,700.  Ginn Title falsely caused the recording of Lot 6 as having sold for the entire $1,817,700 and recorded Lots 13 and 45 as having sold for $1.00.  The Ginn Defendants, including Ginn Title did this to create a falsely inflated value for Lot 6 of $1,817,700 so that such falsely inflated value could, in turn, be used by the participating appraisers and banks to support future inflated  appraisals and the knowing financing of properties with falsely inflated values in connection with sales to unsuspecting buyers.  Lot 6 was later used as a comparable for future appraisals as having being sold for $1,817,700.

(d) In Reunion, on September 29, 2004, Ginn sold Lots 33, 34 and 155, Reunion, Phase II, Parcel III to David Purcell for a total of $546,700. Rather than ascribing a significant portion of the total sale to each of the properties, the Ginn Defendants, including Ginn Title falsely caused each lot to be recorded as having sold for $546,700. These false selling prices were later used as comparables for future appraisals.

(e) On or about December 14, 2004, Wilson Greene, III, purchased Lots 80 and 81, Bella Collina for $510,000 for both lots.  Rather than ascribing a significant portion of the sale to each of the properties, the Ginn Defendants, including Ginn Title caused Lot 80 to be recorded as having been sold for $510,000 and caused Lot 81 to be recorded as having been sold for one dollar. Lot 80 was later used as a comparable for future appraisals as having being sold for $510,000. For example, in March 2005, in connection with James Akouri's purchase of Lot 5, Conservatory, Hammock Beach, SunTrust officer, Jim Shaffer told Akouri, "We appraise with our own company.  It will be approved, don't worry."

33.    Each of the defendants also participated in creating sham sales using Ginn and Lubert-Adler insiders, affiliates, and sales executives and affiliates to create false records of high, continuing, and increasing sales prices to effectuate the schemes to sell Ginn properties to the Plaintiffs at inflated prices and to give credibility to the false statements of value.  Through the use of the mails and wires, the Ginn and Lubert-Adler Defendants and its insiders

a)    Created artificial sales;
b)    Used Ginn and Lubert-Adler insiders as purchasers and sellers;
c)    Set false and artificially inflated prices for sales and fraudulently perpetuated the scheme described herein;
d)    Drafted and disseminated false documentation to support the sham of pre-

arranged sales; and

     e)  Engaged in fraudulent recording of sales prices. Thereby, each of the defendants created artificially "high prices" and sham sales for Ginn properties at Bella Collina and Reunion.

34. The values of the properties were thus inflated by as much as ten times their actual price. The false recording practices and sham sales practices were fraudulent not only by themselves, but they also furthered the scheme by establishing fraudulently inflated prices which were then used as comparables in future appraisals and affected the subsequent sales price of all properties in the Ginn communities of Bella Collina and Reunion downstream to the Plaintiffs.

35. For example, the Ginn defendants used complicit appraisers recruited by them, and relied upon by them, although they knew, or should have known the appraisals did not conform to commonly accepted appraisal standards and improperly exaggerated the value of the properties, relying on sham sales used as comparables and promised amenities.  Although this practice was systematic, they included the following, for example:

    (a) using, without value adjustments, properties for comparables that are dissimilar in terms of objective attributes such as size or location and which are, therefore,  inappropriate under commonly accepted appraisal practices.  For example, the appraisal for Bella Collina, Lot 427 purchased by Alan Siegel for over $1.6 million and financed by Wachovia in a mortgage for over $1.4 million, was based upon comparables from lots that were dissimilar in size in that they were substantially larger than Lot 427. Similarly, participating appraisers used properties in Ilseworth, a well-established expensive and exclusive community, in a superior school district that is located on the very desirable Butler chain of lakes as a comparable for many Bella Collina lots, including Lot 134, Bella Collina, purchased by Plaintiff Andrew Billington for $1,340,900 in July 2004. Bella Collina, an undeveloped community, is not located in a superior school district nor is it located on a desirable body of water, but rather on a polluted lake.  These objective dissimilarities between Isleworth and Bella Collina, made the choice of comparables from Isleworth to appraise, without adjustment, Bella Collina lots plainly improper.  Moreover, Lot 134, sold based on a fraudulent appraisal using comparables from Isleworth to support the first purchase in Bella Collina for over $1 million, was then used by Ginn to fraudulently convince other buyers of the extraordinary "value" of the Bella Collina lots.  For example, on or about January 12, 2005, Lot 137 was sold for $1,340,900, based on the appraisal for Lot 134.

**Plaintiffs Purchase of Lot 332-Bella Collina**

36.     Defendant Ginn Development, LLC which included its members Edward "Bobby" Ginn, Ira Lubert, and Dean Adler, along with Ginn's executive Rusty Rogers, provided Plaintiffs Rae and Taylor in person with marketing materials at the Bella Collina launch and also continued to do so through mailing multiple marketing brochures overseas which they intended Mr. Rae and Mr. Taylor to rely upon in making the purchases including Lot 332 at Bella Collina.

37.     The aforesaid members of Ginn Development made multiple representations to Mr. Rae and Mr. Taylor to fraudulently induce their purchases including at the Bella Collina launch in April of 2004 and Reunion launch in March of 2004.  They also attempted to sell Plaintiffs other Ginn/Lubert-Adler properties at Tesoro, Laurelmor, and Ginn sur Mer, all owned by nominee entities formed by the partnership between the Ginn and Lubert-Adler Defendants. Edward Ginn, along with Ginn executive Rusty Rogers directly touted the purported fair market values of the Bella Collina properties, sales prices, comparable sales and amenities in person to Plaintiffs at Bella Collina. Defendants Edward Ginn, along with Ginn executive, Jeff Cox, directly touted the purported fair market values of the Reunion properties including the sales prices, comparable sales and amenities in person to Plaintiffs at Reunion. For example, at Bella Collina, Plaintiffs were informed by Edward Ginn, Rusty Rogers, and Ginn Development, LLC members that all of the lots had been sold and all of the golf memberships had been taken. However, Bobby Ginn and Rogers subsequently told Plaintiffs in person that Ginn and Lubert-Adler had a special extremely valuable lot which Bobby Ginn and Dean Adler had held back from sale, i.e. Lot 332. Ginn, along with Ginn executive Rusty Rogers, provided marketing materials to the Plaintiffs, which emphasized: Lubert-Adler's ownership interest in the Ginn companies and its partnership with Edward Ginn.

38. The Ginn defendants, orally and in false mailings, and with the authority of each of the defendants, represented to Plaintiffs that the principal owners of Lot 332 had held the lot out of the bidding lottery process and touted the special amenities and value of Lot 332. Plaintiffs were told that the owners of Lot 332 at Bella Collina, Monte Verde, Florida, were the principal owners of Ginn Development, LLC and Ginn-LA, LLC including Bobby Ginn and Dean Adler. The Ginn Defendants represented to Plaintiffs that the lot was a "special lot" valued at a bargain price of $854,900.

39. Based on the misrepresentations and omissions of Bobby Ginn, Rusty Rogers, the Ginn Defendants and Lubert-Adler, as set forth herein, Plaintiffs directly relied upon the fraudulent misrepresentations and inducements made by the Defendants. As a direct and proximate result of the Defendants fraudulent misrepresentations and omissions, Plaintiffs entered into a contract for sale and purchase with principal owner Defendant Dean Adler on September 15, 2004 for $854,900.

40. On October 19, 2004, prior to the closing with Plaintiffs, Bobby Ginn, Dean Adler, and others including Ginn Development's Rusty Rogers, and Teresa Ruddell, a Ginn attorney sent, through interstate mails, a title commitment to Plaintiffs that represented that Lubert-Adler's Dean Adler owned the property.

41. Unbeknownst to the Plaintiffs, they had been fraudulently induced to purchase a piece of vacant land with virtually no amenities and which was essentially worthless for $864,900. Each of the Defendants had failed to disclose critical material facts to the Plaintiffs prior to the closing including, but not limited to:

a) What Dean Adler or nominees had actually paid for Lot 332;

b) The sham comparable sales set forth in paragraph 32 above;

c) The Ginn and Lubert-Adler relationships with the appraisers;

d)     The actual Bella Collina prior sales history and kickback transactions with R-G Crown Bank and Brady Koegel;

e)     That there was no reasonable basis in fact to support the construction of the promised subject amenities set forth in paragraphs 32-35 and the appraisal report for Lot 332.

42.     After investigation by Plaintiffs' counsel in 2013, it was learned that Ginn and Lubert-Adler had previously transferred the vacant land, Bella Collina Lot 332 using their fraudulent co-conspirator financing source, Brady Koegel of R-G Crown Bank, to Dean Adler. Thereafter, while the contract between Dean Adler and the Plaintiffs was already in place on September 15, 2004, Defendant Dean Adler conveyed the vacant lot to a related entity known as A[Adler]&G[Ginn] Enterprises of South Carolina, LLC on October 31, 2004 for an allegedly purported purchase price of $550,000. This transaction was concealed from the Plaintiffs. This transfer was made while the original contract between the Plaintiffs and Dean Adler was already in place. Finally, on November 20, 2004, A[Adler]&G[Ginn] Enterprises conveyed Lot 332 of Bella Collina to Plaintiffs for $854,000.

43.     The Plaintiffs were fraudulently induced to put approximately $450,012 in cash funds down on vacant lot 332 and to finance an additional $400,000 through R-G Crown Bank. The Lubert Adler Defendants, Dean Adler, and Bobby Ginn controlled this entire transaction. Also undisclosed to the Plaintiffs through the present was that A[Adler]&G[Ginn] Enterprises were also manipulating a similar transaction with Andrew Billington on Lot 331 for the nearly identical sum of $854,900, as set forth in paragraph 44 below, where Billington paid the same sales price arranged by the Defendants including Dean Adler, Bobby Ginn, and A&G Enterprises.

44.     Also undisclosed to the Plaintiffs prior to their purchase of Lot 332 was that Ginn Development, LLC and A[Adler] & G[Ginn] Enterprises had further manipulated and sold

vacant land at Bella Collina based on grossly inflated prices, of approximately 10 times the fair market value through artificial insider sham prices to other unsuspecting purchasers at Bella Collina, including but not limited to the following:

| Lot number | Purported Purchase Price Paid by A&G Enterprises | Purported Date of Purchase Paid by A&G Enterprises | Date of new sale By Insiders | Sale Price to New Owners | Minimum Profit to Insiders A&G Enterprises |
|---|---|---|---|---|---|
| 329 | $510,320 | 12/10/2004 | 12/10/2004 | $840,900 | $330,580 |
| 332 | $550,400 | 10/31/2004 | 11/20/2004 | $854,900 | $304,500 |
| 330 | $520,320 | 10/29/2004 | 10/29/2004 | $810,900 | $290,580 |
| 331 | $550,320 | 10/29/2004 | 10/29/2004 | $854,900 | $304,580 |
| 446 | $600,900 | 6/24/2005 | 6/24/2005 | $1,950,000.00 | $1,349,100 |
| Minimum Total Profit earned by A[Adler] & G[Ginn] Enterprises | $2,579,420 | | | | $2,274,840 |

45.    The use of manipulated and fraudulently inflated appraisals in 2004 and 2005 were also a crucial element of the scheme because it made the transactions possible. Defendants knowingly utilized fraudulent appraisals in order to provide Plaintiffs with financing for overpriced property. Moreover, as a result of these practices, the appraised value of the properties purchased by Plaintiffs was fraudulently overstated at the time of purchase, by as much as ten times. Upon information and belief, the Ginn Defendants paid undisclosed kickbacks to appraisers and R-G Crown's officer, Brady Koegel.

46.    In addition, the purchases by participants in the scheme included each of the defendants who also bought at sham prices rather than the grossly inflated values at which Plaintiffs purchased. This reflects their knowledge as insiders, their agreement to engage in the scheme and that they profited by the scheme.  For example, in addition to the fact that Lubert-Adler owned an 80% pecuniary interest in the Ginn developments, Dean Adler, CEO and Co-

Founder of Lubert-Adler formed a partnership with Bobby Ginn called A&G Enterprises, through which Bobby Ginn and Dean Adler purchased Ginn properties at discounted rates, then flipped them for substantial profits to unsuspecting buyers at inflated prices —**sometimes on the same day,** as set forth above**.** A&G Enterprises realized at least a 2.5 million profit in six months from the foregoing transactions in Bella Collina, including from Plaintiffs Rae and Taylor, as set forth in paragraphs 42-44.

47.     Upon information and belief Ginn and R-G Crown Bank also provided kickbacks to Ginn employees, appraisers and bank employees in connection with sales in order to further the overall objective of selling and financing the properties to Plaintiffs at values that were artificially inflated through false representations, deceptively-created impressions of value, scarce supply and high demand and fraudulent appraisals.  Described below is just one further example of the kickbacks and special opportunities offered to employees and associates of Ginn in order to secure their cooperation and participation:

(a)     Nicole Costello, who served as Ginn's closing coordinator/notary, purchased Lot 147, Bella Collina for $242,910.00 on or about December 23, 2004 and, that same day, flipped the property to a buyer named JHM Investments, LLC, for $456,500 yielding a one-day profit of approximately $213,590.   Financing and the appraisal for JHM Investments, LLC, were arranged by and coordinated between Ginn and R-G Crown's Brady Koegel.

48.     All parties to the scheme benefited.   The Ginn and Lubert-Adler Defendants realized profits because the properties were sold to the Plaintiffs at an enormous fraud premium. The artificial and higher sale prices also generated higher fees, commissions, and a greater return.

49.     The Ginn and Lubert-Adler Defendants actively concealed their conduct, their manipulation of property values and their concerted efforts to sell the Ginn properties to Plaintiff at amounts that were far in excess of their actual fair market value from Plaintiffs at the time of

purchase.  Plaintiffs directly relied upon the misrepresentations and omissions set forth herein. As a result, Plaintiffs did not and could not have uncovered the unlawful conduct even though they exercised extreme due diligence.

50.     In direct reliance on the Defendants' misrepresentations and omissions, Plaintiffs paid over $450,000 in cash funds for Bella Collina Lot 332 and paid an additional amount of over $125,000 to date for mortgage payments and paid additional charges, including commissions, and real estate taxes. But for the Defendants' conduct, Plaintiffs would never have purchased Lot 332 which was essentially worthless at the time of purchase.

**Plaintiffs Purchase of Lot 186 at Bella Collina**

51.     In June of 2005, Plaintiffs were again fraudulently induced to purchase another essentially worthless lot at Bella Collina. The Ginn Defendants, including Ginn executive, Rusty Rogers, represented again to Plaintiffs that lots were unavailable but Ginn-LA Pine Island Ltd, LLLP held lot 186 and was selling it for $655,900.

52.     Plaintiffs were induced by the Ginn Defendants to put a cash payment down of approximately $181,000 and execute a note and mortgage for an additional $484,425.  Plaintiffs have paid additional charges for commissions, mortgage payments, and real estate taxes, and still owe over $600,000 for a piece of worthless property.

53.     Ginn Real Estate Company, LLC also arranged to receive a commission on the sale of lot 186 of $43,927.

54.     Lot 186 is currently worth approximately $5,000, not the $655,900 for which it was sold to the Plaintiffs.

**Plaintiffs Purchase of Lot 28 at Reunion**

55.     In or about 2004, Plaintiffs were induced to attend a marketing launch of another Ginn/Lubert-Adler Development known as Reunion Resort set up by Ginn-LA.

56.     Plaintiffs again met Edward Bobby Ginn and again were induced to purchase another vacant lot by the Ginn Defendants including Bobby Ginn and Ginn executive Jeff Cox.

57.     Plaintiffs chose not to purchase a vacant lot at Reunion at the marketing launch.

58.     In 2005, the Plaintiffs were again told by the Ginn Defendants that there were effectively no lots left for sale at Reunion but that Bobby Ginn was working with a featured builder known as Sunshine Dray, LLC and was in a position to sell a "special lot package" known as Lot 28, on which a home could be constructed on the lot.   The Ginn Defendants represented they would coordinate and handle the transaction with Sunshine Dray, LLC and arrange for construction and financing through the Ginn "preferred lender" R-G Crown Bank and featured builder Sunshine Dray.

59.     The Ginn Defendants, including Bobby Ginn and Ginn executive, Jeff Cox induced Plaintiffs to purchase Lot 28 as part of a construction package and were told that R-G Crown Bank, under the direction of Bobby Ginn and R-G Crown's Brady Koegel, would provide a construction loan.

60.     In 2005, Plaintiffs were induced by the Ginn Defendants including Ginn Development, LLC, Bobby Ginn, R-G Crown Bank, A&G Enterprises, and Ginn executive, Jeff Cox to enter into a purchase of the vacant lot for a contract price of $1,300,000. Defendants set the price at $1.3 million and indicated that the vacant Lot 28 would be sold to Plaintiffs for $550,000 and the total contract sales price would be $1,300,000. Defendants fraudulently induced Plaintiffs to purchase the "package" and required Plaintiffs to pay a cash deposit of approximately $353,717 and to execute a note to R-G Crown Bank for an additional approximately $975,000.

61.     Undisclosed to the Plaintiffs were the following:

a.  On June 22, 2004, Ginn-LA Orlando, Ltd., LLLP had sold the vacant lot to Sunshine Dray, LLC for $10.00 but tax records show otherwise;

b.  In 2005 there was no available infrastructure to allow for commencement of construction on Reunion Lot 28 as there was no water, electricity, or utilities and a home could not be built;

c.  Notwithstanding there being **no utilities** available for any construction at Reunion Lot 28, Ginn Real Estate coordinated the sale and received an 8% commission of $104,000 in cash at the closing and other undisclosed kickbacks.

62.     Even though Plaintiffs could not build on the essentially worthless lot, Sunshine Dray, LLC and R-G Crown, under the direction and coordination of Bobby Ginn of Ginn Development, LLC and Ginn executive Jeff Cox, induced Plaintiffs to close on the loan.

63.     Thereafter, the vacant lot could not be built upon, there were no utilities, and no building permits had been drawn.  R-G Crown, under the direction of Ginn, paid 10% of the purchase price paid by Plaintiffs to the builder or $75,000 and subsequently released to Sunshine Dray, LLC an additional $300,000 even though nothing was ever built and no permits were ever issued.  The Ginn Defendants allowed the funds to be released under the construction loan to Sunshine Dray, LLC.  This was part of a side deal between Ginn Development and R-G Crown, undisclosed to Plaintiffs.  Plaintiffs were effectively swindled out of over $650,000 in cash and also had to pay interest on the construction loan.

64.     At all times material, Defendants engaged in self-dealing transactions, and upon information and belief, comingled funds from one development to another.  In 2006, Ginn, Lubert-Adler, and Credit Suisse entered into a further self-dealing transaction which offered the Ginn and Lubert-Adler Defendants the opportunity to take capital and hypothetical future profits out of residential development projects on a "cross-collateralized" basis.

65.     These acts by the Ginn and Lubert-Adler Defendants demonstrate the extent and control which they exercised over all of the Ginn communities, including Bella Collina and

Reunion, and further shows the continuing systematic acts between the Ginn Defendants and Lubert-Adler Defendants through the present date.

- In June 2006, Credit Suisse extended a total of $675 million in loan financing to Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. (entities formed to "pool" Project assets and facilitate the transaction), through a First Lien Credit Agreement ($525 million in total financing) and a Second Lien Credit Agreement ($150 million in financing);

- Each of the Debtors and other Project subsidiaries ("Other Project Entities") was required to execute a purported "Subsidiary Guaranty" providing for "primary and not secondary" liability for the full $675 million loan amount, and to grant mortgages and other liens on substantially all of its assets, without receiving any of the loan proceeds in return;

- Credit Suisse took a substantial fee, in excess of $15 million, and sold off most if not all of the credit to loan participants;

- Existing third-party debt totaling $158 million was refinanced; and

- The Ginn and Lubert-Adler Defendants, as insiders in control of the Debtors and Other Project Entities, **took out and paid themselves and their investors approximately $325 million as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits."**

In other words, as in *In re Yellowstone Mtn. Club, LLC*, the transaction was structured such that "Credit Suisse and the development owners [here, Ginn and Lubert-Adler] would benefit, while their *developments – bore all the risk of loss*." 2009 WL 3094930, at *3 (emphasis added); 436 B.R. 598, 655-60, 674-77 (same).

66.    Thereafter, Plaintiffs continued to pay additional monies on the worthless construction loan in excess of $100,000 to R-G Crown Bank for an essentially worthless piece of property at Reunion.

67.    The Ginn and Lubert-Adler Defendants formed Ginn-LA CS Borrower, LLC, a Delaware Limited Liability Company formed in connection with the loan transaction, whose sole assets consisted of membership interests in the Tesoro, Laurelmor, and other project entities. It

was formed for the sole purpose of "pooling" or "rolling-up" the U.S. Project assets and served as a conduit for the loan proceeds allocated to the U.S. Projects, to the substantial detriment of Plaintiffs.

68.     Similarly, Ginn-LA Conduit Lender, Inc. was formed as a Delaware corporation formed in connection with the loan transaction, with no assets whatsoever. It was created for tax purposes, and served as a conduit for the loan proceeds allocated to Ginn Sur Mer, *i.e*., the Bahamas Project.

69.     As alleged by the Bankruptcy Trustee, the Ginn and Lubert-Adler Defendants entered into multiple self-dealing transactions.   Also according to the Bankruptcy Trustee Dillworth, the Ginn and Lubert Adler Defendants consummated a series of related party transactions in which project entities would sell undeveloped condominium parcels in bulk to affiliates in order to generate needed cash to "feed" the loans and fund development expenses. Shown diagrammatically, in simplified form, the Ginn-LA Credit Suisse loan structure was reported by the Bankruptcy Trustee as follows:



**The Loan Proceed Distributions to Ginn/Lubert-Adler Insiders**

70.   According to Ginn and Lubert-Adler records, the approximately $325 million in Credit Suisse loan proceeds distributed to insiders at the closing of the loan transaction was "deemed to be Funds from a Capital Event originating from [the] Property Owner[s]" and distributed to the original Partners, as follows:

| Project Entities | Tesoro | Quail West | Hammock Bch. | Laurelmor | Gin sur Mer | Total |
|---|---|---|---|---|---|---|
| Ginn "Promote" | $5,357,044.85 | $1,785,681.62 | $0.00 | $0.00 | $0.00 | $7,142,726.47 |
| Lubert-Adler Debt Pay-Off | $0.00 | $19,675,813.02 | $25,576,449.47 | $51,105,603.89 | $0.00 | $96,357,866.38 |
| Lubert-Adler Accrued Interest | $0.00 | $1,394,436.65 | $2,918,102.88 | $3,340,144.56 | $0.00 | $7,652,684.09 |
| Lubert-Adler Equity | $76,298,706.81 | $8,611,730.28 | $3,397,383.42 | $11,175,677.33 | $71,240,826.58 | $170,724,324.42 |
| Lubert-Adler Preferred Return | $6,384,354.18 | $909,513.44 | $410,190.47 | $973,204.19 | $4,298,201.98 | $12,975,463.56 |
| Lubert-Adler Profit | $21,413,194.24 | $6,997,723.04 | $0.00 | $0.00 | $0.00 | $28,410,917.28 |
| Subtotal | $109,453,300.09 | $39,374,898.05 | $32,302,126.24 | $66,594,629.97 | $75,539,027.86 | $323,263,982.20 |
| Overhead/Post-Closing Costs | | | | | | $4,998,000.00 |
| Grand Total | | | | | | $328,261,982.20 |

71.   Through the loan transaction, the Ginn and the Lubert-Adler Defendants not only enriched themselves and their investors at the expense of the Plaintiffs and project entities, they effectively looted the projects of value and shifted the risks associated with the projects, leaving the projects with a virtual certainty of loss.

72.   The transaction was, in effect, "[a] cash out Mortgage," through which "equity" was paid while Plaintiffs were certain to lose virtually all of their investments.

73.   Ginn and the Lubert-Adler entities did not act in good faith in orchestrating the loan transaction.  Nor did they act in the best interests of the Plaintiffs at any time.

74.     They acted out of self-interest, with actual fraudulent intent; and, in the process, rendered the projects significantly insolvent and much too thinly capitalized to survive.

75.     Indeed, Ginn's second-in-command, Robert F. "Bobby" Masters, the C.E.O. and President of many of the Ginn entities, candidly acknowledged as much in a smoking-gun email exchange with Ginn-LA outside attorney John G. "Sonny" Morris and Lubert-Adler principal Neill B. Faucett shortly after the closing of the loan transaction, before the proverbial "ink" on the loan documents had dried.  That email exchange evidenced the  fraudulent  nature of the loan transaction  and the fact that the monetization of the Debtors' assets had sealed their demise:

> Email From Bobby Masters, 06/08/06, 5:25 p.m.
>
> The Credit Suisse deal has closed.  Wires on the way.  Sonny, *please prepare the deed-in-lieu.*
>
> Reply From Neill Faucett of Lubert-Adler and Ginn Development, LLC, 06/08/06, 6:31 p.m.
>
> *Well said.*

E-mail Stream, R. Masters to/from J. Morris and N. Faucett, 06/08/06, MMMTQW01_176536 (emphasis added).

**"John Doe" Defendants**

76.     Defendants John Does 1-50 are as-yet-unidentified persons and/or entities which, with respect to the fraudulent acts alleged herein, satisfy the requirements or are liable on the other claims asserted herein or who hold Edward "Bobby" Ginn's assets.

77.     To the extent such persons and/or entities are identified, leave will be sought to include them as Defendants herein.

78.     The applicable statutes of limitations have been tolled for all purposes for all claims by Plaintiffs due to among other things:

a) The class actions pending in *Demsheck v. Ginn Development Company, LLC, et al.*, Case No. 3:09-cv-00335-HLA-TEM (M.D.FL) and *Lawrie v. Ginn Development Company, LLC, et al.*, Case No. 3:09-cv-00446-TJC-HTS (M.D.FL).

79.     In addition, any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

80.     Because of the self-concealing nature of Defendants actions and their affirmative acts of concealment, Plaintiffs also assert the equitable tolling of any applicable statutes of limitations affecting the claims raised herein.

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(C) – RICO**
**(As to all Defendants W/R/T The Ginn Enterprise)**

81.     Plaintiffs hereby incorporate by reference paragraphs 1-27, 29-39 and 41-80 as if fully set forth herein.

82.     As set forth above and in the succeeding sections of this Count, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Ginn Enterprise and/or in the alternative the Alternative Enterprise, through a pattern of racketeering, including acts indictable under 18 U. S. C. §§ 1341 and 1343.

A.     **Enterprise Allegations**

(1)     **The Ginn Enterprise**

83.     Plaintiffs, and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

84.     Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals persons associated in fact who constitute a RICO enterprise that is referred to herein as the "Ginn Enterprise": Ginn Development Company, LLC, Lubert-Adler Partners, L.P., Ginn Title Services, LLC, Edward R. Ginn, III, Dean Adler, Ira Lubert, Edward R. Ginn III Revocable Trust, ERG Enterprises, L.P., Lubert-Adler Management Co., L.P., and A&G Enterprises of South Carolina, LLC. The Ginn Enterprise is an organization which operated in furtherance of a common purpose to defraud Plaintiffs members beginning in or around 2004 and continuing to date (or such other date as shall be determined from the books and records of the Defendants) and whose activities affected interstate commerce.

85.     While each of the Defendants participated in and are members *an*d part of the Ginn Enterprise, they also have an existence separate and apart from the enterprise.

86.     The Ginn Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged. This role and structure is reflected in the allegations above.  In particular, the Ginn Defendants and the Lubert-Adler Defendants conceived of the plan.  All of the Ginn Enterprise participants entered into this scheme in order to reap extraordinary, illegal profits and each knowingly played a part in fostering the misrepresentations, fraud, and deception necessary to the success of the scheme.

### (2)     Alternative Enterprise Allegations

87.     Plaintiffs, and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

88.     Based upon Plaintiffs' current knowledge, the following persons constitute a group of individual persons associated in fact who constitute a RICO enterprise that is referred to herein as the "Alternative Enterprise": Ginn Development Company, LLC, Lubert-Adler Partners, L.P., Ginn Title Services, LLC, Edward R. Ginn, III, Dean Adler, Ira Lubert, Edward

R. Ginn III Revocable Trust, ERG Enterprises, L.P., Lubert-Adler Management Co., L.P., and A&G Enterprises of South Carolina, LLC. The Alternative Enterprise is an organization which operated in furtherance of a common purpose to defraud Plaintiffs beginning in or around 2004 and continuing as shall be determined from the books on record of the Defendants and whose activities affected interstate commerce.

89.     While Ginn Development Company, LLC, Lubert-Adler Partners, L.P., Ginn Title Services, LLC, Edward R. Ginn, III, Dean Adler, Ira Lubert, Edward R. Ginn III Revocable Trust, ERG Enterprises, L.P., Lubert-Adler Management Co., L.P., and A&G Enterprises of South Carolina, LLC participated in and are members and part of the Alternative Enterprise, they also have an existence separate and apart from the enterprise.

90.     The Alternative Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged. This role and structure is reflected in the allegations above.  In particular, the Ginn Defendants and Lubert-Adler Defendants conceived of the plan to implement the common marketing and sales strategy.  Ginn also brought Ginn Title in to create public records with false information which served as a foundation for the fraudulently inflated appraisals upon which the inflated sales prices were based.  All the Alternative Enterprise participants entered into this scheme in order to reap extraordinary, illegal profits and each knowingly played a part in fostering the misrepresentations, fraud, and deception necessary to the success of the scheme.

91.     The Alternative Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

**B.**     **Conduct of the RICO Enterprise**

    **(1)**     **Conduct of the Ginn Enterprise**

92.    As members of the Ginn Enterprise, Ginn Development Company, LLC, Lubert-Adler Partners, L.P., Ginn Title Services, LLC, Edward R. Ginn, III, Dean Adler, Ira Lubert, Edward R. Ginn III Revocable Trust, ERG Enterprises, L.P., Lubert-Adler Management Co., L.P., and A&G Enterprises of South Carolina, LLC followed this conduct in support of the enterprise:

(a)    The Ginn Defendants and Lubert-Adler Defendants invested funds to secure and preliminarily develop the property to be developed for sale in lots to individual purchasers such as Plaintiffs with promises of amenities and facilities which they could not or did not intend to provide thereby inducing Plaintiffs to make purchases of property at inflated prices and with    the false belief that the amenities promised would be provided.

(b)    The Ginn Defendants and Lubert-Adler Defendants conceived, developed and implemented a common  scheme to market and sell property in Ginn communities at inflated prices designed to mislead prospective buyers.

(c)    Under the direction of the Ginn and Lubert-Adler Defendants, Ginn Title knowingly and intentionally caused the inaccurate and deceptive recording of property sales in the Ginn communities, knowing that the improperly recorded property prices would be used to further the objectives of the fraudulent scheme as those properties which were recorded with inaccurate prices would be used as "comparables" in appraisals used to fraudulently inflate the value of property in the Ginn communities.

### (2) Conduct of the Alternative Enterprise

93.    As members of an enterprise, Ginn, Lubert-Adler, Ginn Title engaged in the following conduct:

(a)    Ginn and Lubert-Adler invested funds to secure and preliminarily develop the property to be developed for sale in lots to individual purchasers such as Plaintiffs with promises of amenities and facilities which they could not or did not intend to provide.  This induced Plaintiffs to make purchases of property at inflated prices and with the false belief that the amenities promised would be provided.

(b)    Ginn and Lubert-Adler conceived, developed and implemented a common scheme to market and sell property in Ginn communities at inflated prices designed to mislead prospective buyers.

(c)    The members of the Alternative Enterprise agreed to fraudulently manipulate the values of the properties through misrepresentations.

(d)     The members of the Alternative Enterprise retained inflated profits from the sale of real estate and services resulting from the conduct of the illegal enterprise.

**C. Predicate Acts Mail and Wire Fraud:  18 U.S.C. § 1341 AND 8 U.S.C. § 1343**

94.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have engaged in conduct violating each of these laws to effectuate their scheme.

95.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises, each of the Defendants, in violation of 18 U.S.C. § 1341, on more than two occasions, beginning in 1998 and continuing through 2008, either caused matter and things to be delivered by the Postal Service or by private or commercial interstate carriers or knew and agreed that matter and things would be delivered by the Postal Service or by private or commercial interstate carrier to carry out the objectives of the scheme.

96.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1343, transmitted, caused to be transmitted and/or received by means of wire communication in interstate and foreign commerce, various writings, signs and signals or knew and agreed to the use wire communications to carry out the objectives of the fraudulent scheme.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

97.     Defendants carried out their scheme in different states and internationally and could not have done so unless they used the Postal Service or private or commercial interstate carriers and the wires in interstate and foreign commerce.

98.     Defendants knew or should have foreseen that the use of the mails and wires would be required to carry out the scheme.

99.     Each of the Defendants sent matter and things via the Postal Service, private or commercial carrier, wire or other interstate media include, *inter alia,* as described in the foregoing incorporated paragraphs and set forth with specificity herein below.

100.    Ginn, having devised, controlled and implemented the fraudulent scheme to defraud Plaintiffs used, and/or agreed to the use of, the mails and wires to execute the plan in furtherance of the scheme.  Specific examples of such predicate acts agreed to by Ginn are:

(a)     Using the mails and wires with the intention of inducing Plaintiffs to purchase property in Ginn communities at fraudulently inflated prices and in connection therewith mailed or wired priority reservation agreements and priority selection forms to Plaintiffs and for each of the following Ginn community launches:

1. Reunion – in or about March 2004;

2. Bella Collina – in or about April 2004;

(b)     Intentionally communicating incorrect, false and misleading information regarding the sales prices for properties at Bella Collina and Reunion using the mails and wires as described herein;

(c)     Sending correspondence and communications to Plaintiffs regarding contracts, agreements, appraisal reports, financing documents, powers of attorney and other materials which were used to advance the objectives of the fraudulent scheme using the mails and wires.  The mails and wires were used in conjunction with each of the Plaintiffs described herein;

(d)     Using the mails and wires to communicate with other Defendants to advance the objectives of the fraudulent scheme including the emails and other communications written and sent to orchestrate fraudulent appraisals and financing for properties at inflated prices to the Plaintiffs.

101.    The Lubert-Adler Defendants, having devised, controlled and implemented the fraudulent scheme to defraud Plaintiffs, used and/or agreed to the uses of the mails and wires to execute the plan in furtherance of the scheme.  Specific examples of such predicate acts agreed to by the Lubert-Adler Defendants are:

(a)    Agreeing to the use mails to invite prospective purchasers to sham launch parties in furtherance of the fraudulent scheme as described herein;

(b)    Agreeing to the use of its name and logo side by side with that of the Ginn Company in promotional materials advertising the Ginn communities, including in flyers sent to purchasers, agents and brokers using the mail and wires at various times during the operation of the fraudulent scheme;

(c)    Agreeing to the use of the mails and wires to communicate false promises of amenities to be constructed at Ginn communities transmitted by email, fax and through the U.S. mail to the Plaintiffs as described herein; and

(d)    Using the mails and wires to transmit the money used to fund the purchase of the land and development costs of Bella Collin and Reunion beginning from 2004.

(e)    Using the mails and wires to communicate with other Defendants to advance the objectives of the fraudulent scheme including the emails and other communications written and sent to orchestrate fraudulent appraisals and financing for properties at inflated prices.

**D. Pattern of Racketeering Activity**

102.    Defendants did knowingly, willfully and unlawfully engage in a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1961(5), by committing at least two acts of racketeering activity, *i.e.* indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years.  In fact, each of the Defendants has committed multiple acts of racketeering activity, all of which were intended to and did advance the plan to perpetrate a fraud, through misrepresentations and deception, to convincingly market, finance and sell properties in the Ginn communities at prices that exceeded the true market value of such properties at the time they were sold. Each act of racketeering was related, had a similar purpose,

involved the same or similar participants and means of commission, had similar results and impacted similar victims, including Plaintiffs.

103.    The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). Each of the Defendants agreed to fulfill its assigned role as is evidenced by the activities undertaken by each and predicate acts performed by each as detailed herein.

**E. Defendants' Conduct Caused Direct Injury to Plaintiffs**

104.    Plaintiffs suffered direct and proximate harm as a result of Defendants' misrepresentations, omissions, deceptions and acts of concealment as Plaintiffs paid more for the properties they purchased in Ginn communities than they were worth at the time they purchased them. Absent the conduct alleged herein, pursuant to which, as detailed above, the apparent value of Ginn properties was inflated as a result of fraud, manipulation, misrepresentations, deception and knowing breaches of professional recording, appraising and banking standards, Plaintiffs would have been advised of and known the true market value of the properties at the time they purchased them and would not have paid, or agreed to pay, the above-market prices that they were induced to pay or agreed to pay as a result of the scheme.

105.    As set forth above, Plaintiffs relied on the Ginn and Lubert-Adler Defendants misleading conduct, fraud, omissions and misrepresentations when buying property at Bella Collina and Reunion which resulted in substantially and artificially inflated prices.   Absent Defendants' misrepresentations, omissions, fraud, misleading conduct, and unconscionable conduct, Plaintiffs would not have bought the property at issue or would have bought the property at a significantly reduced prices.

106.    As a result of Defendants' actions, Plaintiffs have suffered significant injury to their property and/or business including but not limited to the deposits and payments Plaintiffs paid for the property and closing costs and other costs and fees and because they entered into loan obligations that they would not have had if they had known the truth. Plaintiffs were also injured because the properties they purchased were significantly less valuable than represented by Defendants at the time of purchase and have become even less valuable as a result of Defendants' conduct.

107.    Plaintiffs have suffered losses that are directly related to Defendants' conduct which are separate and distinct from losses resulting from the market downturn because they paid too much for properties at the time they purchased them as a consequence fraudulent overpricing that resulted from the conduct of the Ginn Enterprise and/or the Alternative Enterprise. Thus, while the real estate market in Florida and elsewhere has declined in recent years, that decline is not the cause of losses experienced and sought in this lawsuit.  Rather, the enormous fraud premium paid at the time of purchase based upon the phantom value falsely represented to exist through the conduct alleged herein is a loss directly related to the conduct alleged herein.

108.    As a result of Defendants' fraudulent scheme, Defendants have obtained money and property belonging to Plaintiffs, and the Plaintiffs have been injured in their business and/or property by the Defendants' overt acts of mail and wire fraud.

109.    As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Ginn Enterprise, and/or in the alternative, the Alternative Enterprise through a pattern of racketeering, including acts indictable under 18 U.S.C. §§ 1341 and 1343.

110.    As a direct and proximate result of Defendants' misrepresentations, manipulations, fraud and omissions as herein alleged, Plaintiffs have been injured in their business and/or property by the predicate acts which make up the Defendants' pattern of racketeering activity through the Ginn Enterprise, or in the alternative, the Alternative Enterprise, in excess of three million ($3 million) dollars, to be trebled.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(D) – RICO**
**(As To All Defendants)**

111.    Plaintiffs hereby incorporate by reference paragraphs 1-27, 29-39, and 41-109 as if fully set forth herein.

112.    In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c). The conspiracy commenced at least as early as 1998 and is continuing. The object of the conspiracy was to perpetrate a fraud, *i.e.*, to sell real estate in Ginn developments at falsely inflated prices thereby wrongfully extracting additional money from purchasers through deception, and increasing profits for Defendants.

113.    As set forth above, each of the Defendants knowingly, willfully, and unlawfully agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs and activities of the Ginn Enterprise, or in the alternative, the Alternative Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§ 1341 and 1343 in violation of 18 U.S.C. § 1962(c) as alleged in Count I, above.

114.    The agreement between and among the Defendants to act in concert to defraud Plaintiffs is evident from the conduct in which each engaged that supported and was utilized by the others to bring the fraud to fruition:

(a)    The payment and provision of kickbacks and sweetheart deals to the Ginn Defendants, Dean Adler and the Lubert-Adler Defendants.

37

115.    Defendants committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of such conspiracy as alleged in Count I.

116.    The purpose of the acts that caused injury to Plaintiffs was to advance the overall objective of the conspiracy and the harm to Plaintiffs members was a reasonably foreseeable consequence of Defendants' scheme.

117.    As a direct and proximate result of Defendants misrepresentations, manipulations, fraud and omissions as alleged herein, Plaintiffs have been injured in their business or property by the Defendants' conspiracy and by the predicate acts which make up  Defendants' pattern of racketeering activity through the Ginn Enterprise, or in the alternative, the Alternative Enterprise in excess of three million ($3 million) dollars to be trebled.

**COUNT III**
**CIVIL CONSPIRACY TO DEFRAUD**
**(As To All Defendants)**

118.    The Plaintiffs hereby incorporate by reference paragraphs 1-80.

119.    The Ginn Defendants and the Lubert-Adler Defendants and the Lubert-Adler Defendants entered into an agreement to artificially inflate the value of properties in the Ginn Communities through numerous acts of fraud and misrepresentations with intent to defraud the Plaintiffs.

120.    Defendants were aware of and participated in the conspiracy to defraud the Plaintiffs.

121.    The agreement between and among the Defendants to act in concert to defraud Plaintiffs is evident from the overall fraud in which each engaged that supported and was utilized by the others to bring the fraud to fruition:

> (a)    The Ginn and Lubert–Adler Defendants effectively and convincingly marketed the properties in Ginn Communities as if all of the promised amenities would be built and the conduct in devising and implementing

marketing plans that employed misrepresentations and deceptions as alleged herein to accomplish that goal reflects the agreement of these participants to the common objective;

(b)    The payment and provision of kickbacks and sweetheart deals to Ginn, Lubert-Adler, officers, employees and agents to grease the gears of the mechanism effectuating the fraud reflects agreement of those providing, accepting and arranging such kickbacks, as alleged herein.

122.    Each of the Defendants engaged in multiple overt acts in furtherance of the conspiracy to defraud purchasers of property in Ginn communities through sale and financing of properties in Ginn communities at inflated prices, including misrepresenting the true value of the properties the Plaintiffs purchased through a variety of means including:

(a)    Employing marketing strategies, representations and tactics such as those described herein to create the false impression of extremely high demand and value;

(b)    Knowingly procuring and utilizing false records of sales and improperly exaggerated appraisal values as described herein in connection with the sale and financing of properties in the Ginn communities; and

(c)    Securing the aid and assistance of officers, employees and agents through the payment of kickbacks and provisions of sweetheart deals as described herein and partnering with insiders to reap profits therefrom, all to knowingly mislead Plaintiffs about the availability and true value of properties in the Ginn communities thereby inducing them to purchase properties at inflated prices that they would not have purchased had they known the truth.

123.    Defendants made or directed others to make false statements or omissions of material facts to the Plaintiffs in connection with their property dealings in the Ginn communities as hereinabove alleged in sales and promotional materials and on site interactions, in public records that they caused to be recorded, on appraisals, and the financing process and documents.

124.    Plaintiffs reasonably relied to their detriment on the misrepresentations, lies, omissions and deceptive behavior of Defendants which were done in furtherance of their conspiracy.

125.     Plaintiffs were damaged by Defendants' concerted effort to defraud them through misrepresentations and misleading statements, by causing them to pay, or agree to pay and finance,  more for the properties at Bella Collina and Reunion at the time they were purchased, by saddling them with properties that are worth far less than represented by Defendants acting in collusion with each other and by causing them to take on more debt and obligations than they would have absent the Defendants fraudulent and misleading behavior.  Each of the Defendants benefitted as herein alleged through their participation in the conspiracy.

## COUNT IV
## NEGLIGENT SUPERVISION
### (As to the Lubert-Adler Defendants)

126.     Plaintiffs hereby incorporate by reference paragraphs 17-24, 28, 36-62 as if fully set forth herein, which paragraphs describe the conduct of the executives, loan officers, agents and/or employees of Lubert-Adler.

127.     The unlawful, deceptive, fraudulent, collusive, self-dealing, and misleading conduct employed by the Ginn Defendants and its predecessors-in-interest caused substantial injury to Plaintiffs.

128.     At all times, Lubert-Adler had a duty to act in good faith.

129.     The manipulation of appraisal values was accomplished by the executives, loan officers, agents and/or employees of the Ginn Defendants and its predecessors-in-interest through means that departed from accepted standards of appraisal and valuation which should have been known to Lubert-Adler and its predecessors-in-interest upon conducting appropriate oversight and supervision through routine examination of lending files, appraisal reports and loan documentation. Moreover, the high volume and substantial value of the mortgage loans for properties in Bella Collina and Reunion that were generated by the conduct of the executives, loan officers, agents and/or employees of the Ginn Defendants and its predecessors-in-interest,

should have made Lubert-Adler and its predecessors, aware of the unlawful, deceptive, fraudulent, collusive, self-dealing, and misleading conduct of the Ginn Defendants executives, loan officers, agents and/or employees.

130.    Although Lubert-Adler should have been aware, of the unlawful, deceptive, fraudulent, collusive, self-dealing, and misleading conduct of the Ginn Defendants, and although Lubert-Adler and its predecessors, had the ability to take action to control the Ginn Defendants, loan officers, agents and/or employees, they did not take the steps necessary and available  to prevent the conduct, such as investigation, discharge, reassignment, reprimand or referral to appropriate law enforcement authorities.

131.    The failure of Lubert-Adler to take action to control the Ginn Defendants executives, loan officers, agents and/or employees, and the Ginn Defendants conduct which they should have been aware of, including the misleading conduct of their executives, loan officers, agents and/or employees, as alleged herein, constitutes negligent supervision and a breach of Lubert-Adler's duties to act in good faith.

132.    As a direct and proximate result of the failure of the Lubert-Adler Defendants to take action to supervise and control the Ginn Defendants executives, loan officers, agents and/or employees, which they should have been aware of, the Ginn Defendants engaged in unlawful, deceptive, fraudulent, collusive, self-dealing, and misleading conduct as alleged herein and caused substantial injury to Plaintiffs for which the Lubert-Adler is liable.

**COUNT V**
**Violation of 15 U.S.C. § 1703 – The Interstate Land Sales Full Disclosure Act**
**(Brought on behalf of Plaintiffs against all Defendants)**

133.    Plaintiffs hereby incorporate paragraphs 1-80 as if fully set forth herein.

134.    The Ginn and Lubert-Adler Defendants are developers and/or agents within the meaning of 15 U.S.C. § 1701.

135.    Plaintiffs are purchasers within the meaning of 15 U.S.C. § 1701.

136.    Defendants subdivided their developments into lots within the meaning of 15 U.S.C. § 1701 and offered such lots for sale in accordance with a common promotional plan.

137.    The sales at issue in this litigation are not exempt sales as set forth in 15 U.S.C. § 1702.

138.    Defendants have violated 15 U.S.C. § 1703 by utilizing instruments of transportation or communications in interstate commerce including the United States mail service with respect to the sale of lots that are not exempt under U.S.C. § 1702.

139.    As set forth above, Defendants have employed devices, schemes, or artifices to defraud.

140.    Defendants' intent has been to obtain money or property by means of untrue statements of material fact, by omitting to state materials facts necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to information pertinent to the lots and subdivisions within Defendants' developments.

141.    As set forth in detail above, Defendants have engaged in transactions, practices and course of business which operated as a fraud or deceit upon Plaintiffs and Class members as purchasers of property with Defendants' developments.

142.     As set forth in detail above, Defendants have engaged in transactions, practices and course of business which operated as a fraud or deceit upon Plaintiffs and Class members as purchasers of property with Defendants' developments.

143.     Defendants represented that amenities would be provided or completed by the developer.  All promised amenities have in fact not been provided.

144.     As set forth above, Defendants have also violated 15 U.S.C. § 1703 because Defendants failed to provide a property report "in advance of the signing of any contract or agreement" by purchasers in Defendants' developments.

145.     As a direct and proximate result, Plaintiffs have been injured.

**COUNT VI**
**Violation of 15 U.S.C. § 1707 – The Interstate Land Sales Full Disclosure Act**
**(Brought on Behalf of Plaintiffs against All Defendants)**

146.     Plaintiffs hereby incorporate paragraphs 1-80 as if fully set forth herein.

147.     The Ginn and Lubert-Adler Defendants are developers and/or agents within the meaning of 15 U.S.C. § 1701.

148.     Plaintiffs are purchasers within the meaning of 15 U.S.C. § 1701.

149.     Defendants subdivided their developments into lots within the meaning of 15 U.S.C. § 1701 and offered such lots for sale in accordance with a common promotional plan.

150.     The sales at issue in this litigation are not exempt sales as set forth in 15 U.S.C. § 1702.

151.     As set forth above, Defendants violated the Act by executing agreements prior to providing purchasers a property report as mandated by the Interstate Land Sales Full Disclosure Act.

152.     In addition, the property reports as provided violated 15 U.S.C. § 1707 because the reports contained material omissions.

153.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured.

**COUNT VII**
**FRAUDULENT INDUCMENT**
**(As to the Ginn Defendants)**

154.    Plaintiffs hereby incorporate paragraphs 1-80 as if fully set forth herein.

155.    The Ginn Defendants fraudulently, and with the intent to defraud, induced the Plaintiffs to purchase Lots 332 and Lot 186 at Bella Collina and Lot 28 at Reunion.

156.    The Plaintiffs directly relied on the Ginn Defendants' acts of fraudulent inducement.

157.    As a direct and proximate result of the Ginn Defendants acts of fraudulent inducement and concealment, the Plaintiffs suffered damages in excess of $3 million, to be specifically proven at trial.

158.    But for the Ginn Defendants' acts of fraudulent concealment, Plaintiffs would not have purchased Lots 332, 186 and Lot 28 at Reunion.

WHEREFORE, Plaintiffs seek recession of the contracts, full compensatory and punitive damages and such other relief as this Court deems appropriate against the Ginn Defendants.

**COUNT VIII**
**FRAUDULENT INDUCEMENT**
**(As to the Lubert Adler Defendants, Ginn Development, LLC, Dean Adler and A&G Enterprises of South Carolina, LLC)**

159.    Plaintiffs hereby incorporate paragraphs 1-80 as if fully set forth herein.

160.    Dean Adler and A&G Enterprises of South Carolina, LLC fraudulently, and with the intent to defraud, induced the Plaintiffs to purchase Lot 332 at Bella Collina.

161.    The Plaintiffs directly relied on the acts and omissions of Dean Adler, A&G Enterprises of South Carolina, LLC and Ginn Development, LLC which fraudulent induced the Plaintiffs to purchase Lot 332.

162.    As a direct and proximate result of Dean Adler, A&G Enterprises of South Carolina, LLC, and Ginn Development, LLC's acts of fraudulent inducement and concealment, the Plaintiffs suffered damages in excess of $3 million, to be specifically proven at trial.

163.    But for the acts and omissions of Dean Adler, A&G Enterprises of South Carolina, LLC, and Ginn Development, LLC's acts of fraudulent concealment, Plaintiffs would not have purchased Lot 332 at Bella Collina.

WHEREFORE, Plaintiffs seek recession of the contracts, full compensatory and punitive damages and such other relief as this Court deems appropriate against Dean Adler, the Lubert-Adler Defendants, and A&G Enterprises of South Carolina, LLC.

## COUNT IX
## FRAUD
### (Against All Defendants)

164.    Plaintiffs hereby incorporate paragraphs 1-80 as if fully set forth herein.

165.    The Defendants fraudulently, and with the intent to defraud, induced the Plaintiffs to purchase Lots 332 and Lot 186 at Bella Collina and Lot 28 at Reunion.

166.    The Ginn Defendants' acts and omission constitute fraud and deceit.

167.    The Lubert-Adler Defendants' acts and omissions constitute fraud and deceit and aided and abetted the Ginn Defendants' fraud.

168.    The Plaintiffs directly relied on the Defendants' acts of fraudulent inducement.

169.    As a direct and proximate result of the Defendants acts of Inducement and concealment, the Plaintiffs suffered damages in excess of $3 million, to be specifically proven at trial.

170.    But for the Defendants' acts of fraudulent concealment, Plaintiffs would not have purchased Lots 332, 186 and Lot 28 at Reunion.

WHEREFORE, Plaintiffs seek recession of the contracts, full compensatory and punitive damages and such other relief as this Court deems appropriate against all Defendants.

## COUNT X
### Breach of Fiduciary Duty
### (Against all Defendants)

171.    Plaintiffs hereby incorporate paragraphs 1-80 as if fully set forth herein.

172.    The Ginn Defendants, as a result of the special trust and confidence placed in them by the plaintiffs, owed a fiduciary duty to the Plaintiffs.

173.    The Lubert-Adler Defendants, as a result of the special trust and confidence placed in them by the Plaintiffs, owed a fiduciary duty to the Plaintiffs.

174.    Defendants breached their fiduciary duties owed to the Plaintiffs.

175.    The Ginn and Lubert-Adler Defendants knew that the Plaintiffs were relying on their representations and placed special trust in the Defendants and the "Defendant Fiduciaries" exercised control over the will, conduct, and interest of the Plaintiffs.

WHEREFORE, Plaintiffs seek recession of the contracts, full compensatory and punitive damages and such other relief as this Court deems appropriate against the Lubert-Adler Defendants.

## COUNT XI
### Unjust Enrichment
### (Against all Defendants)

176.    Plaintiffs hereby incorporate paragraphs 1-80 as if fully set forth herein.

177.    The Defendants fraudulently, and with the intent to defraud, induced the Plaintiffs to purchase Lots 332 and Lot 186 at Bella Collina and Lot 28 at Reunion.

178.    Defendants received from Plaintiffs a benefit in the form of over two million dollars that was the result of their misrepresentations and fraudulent acts.

179.    As a result, Plaintiffs have conferred a benefit on the Defendants and the Defendants, with full knowledge of this benefit, voluntarily accepted and retained the benefit conferred on them.

180.    Defendants will be unjustly enriched if they are allowed to retain the benefits, and Plaintiffs are entitled to an amount equal to the amount Plaintiffs enriched Defendants and for restitution which Defendants has been unjustly enriched.

## COUNT XII
## NEGLIGENT MISREPRESENTATION
### (Against the Lubert-Adler Defendants)

181.    Plaintiffs hereby incorporate paragraphs 6-8, 17-24, 26, 28, 36-63 as if fully set forth herein

182.    The Lubert-Adler Defendants negligently made the misrepresentations set forth in paragraph 26.

183.    The Lubert-Adler Defendants negligently made the misrepresentations in paragraph 28.

184.    As a direct and proximate cause of the negligent misrepresentations, Plaintiffs relied thereon and sustained substantial damages.

## PRAYER FOR RELIEF

The Plaintiffs request that this Court grant the following relief:

A.    Find that Defendants have violated 18 U.S.C. §§ 1962(c) and (d);

B.     Enjoin Defendants from further violations of 18 U.S.C. §§ 1962(c) and (d);

C.     Find the Lubert-Adler Defendants liable for Negligent Supervision;

D.     Find that Defendants have unlawfully engaged in a civil conspiracy to defraud the Plaintiffs;

E.     Find the Defendants liable for violation of 15 U.S.C. § 1703 and 1707;

F.     Find the Defendants liable for fraudulent inducement, fraud, breach of fiduciary duty and unjust enrichment;

G.     As to all Counts, order Defendants to pay damages in an amount to be determined at trial in excess of $3 million;

H.     As to Counts I and II, order Defendants to pay treble damages to Plaintiffs;

I.     Award Plaintiffs, the costs and disbursements of this action, including reasonable attorneys' fees and the reimbursement of expenses in amounts to be determined by the Court;

J.     Award pre-judgment and post-judgment interest; and

K.     Grant such other and further relief as the Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs request a jury trial on any issue so triable.


DATED: June 19, 2013                */s/Kenneth G. Gilman*_____
                                    Kenneth G. Gilman
                                    GILMAN LAW LLP
                                    Beachway Professional Center Tower
                                    8951 Bonita Beach Road, Suite 525-405
                                    Bonita Springs, FL  34135
                                    Telephone:  (239) 221-8301
                                    Facsimile:  (239) 676-8224
                                    Email: kgilman@gilmanpastor.com


                                    *Attorneys for Plaintiffs*